IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 8:23CR86 |
| Plaintiff, | ) | |
| | ) | BRIEF IN SUPPORT |
| v. | ) | MOTION TO |
| | ) | DISMISS THE INDICTMENT |
| | ) | AND REQUEST FOR HEARING |
| RICHARD WESLEY MARSHALL, | ) | |
| Defendant. | ) | |

I.   COUNT I ALLEGES MULTIPLE CONSPIRACIES AS OPPOSED TO A SINGLE OVERALL CONSPIRACY. AS A RESULT, THERE IS NO VENUE IN THE DISTRICT OF NEBRASKA IN RELATION TO MR. MARSHALL AND THE SECOND SUPERSEDING INDICTMENT MUST BE DISMISSED IN ITS ENTIRETY.

A.   MULTIPLE CONSPIRACIES

Count I of the second superseding indictment in this case charges Mr. Marshall in a conspiracy to possess with intent to distribute 1000 kilograms or more of a mixture and substance containing a detectable amount of marijuana, and a mixture, compound and preparation containing tetrahydrocannabinol ("THC"), its salts, isomers, and salts of its isomers, contained in distillate a/k/a hashish oil and contained in "wax" a/k/a "shatter". That conspiracy is alleged to have an unknown beginning but at least as early as on or about January 1, 2000 and lasting through on or about August 31, 2021, in the District of Nebraska and elsewhere.

Counts II and III, allege violations of 18 U.S.C. § 1956(a)(1)(B)(i) and 1956(h) and 2 respectively in the District of Nebraska and elsewhere[1]. Both counts require the

---

[1] Counts II and III require dismissal regardless of the duplicity of count I as argued in section II below in more detail.

unlawful activity of distribution and conspiracy to distribute marijuana as the underlying act creating the proceeds which are alleged to have been laundered and not reported. To that extent, count I of the second superseding indictment is a requisite offense for counts II and III[2].

There are eleven other named defendants in the second superseding indictment. To date, the government has provided over 4 terabytes of data as part of discovery[3]. Review of that discovery makes it clear that count I of the second superseding indictment is duplicitous. It is clear there are multiple, discrete agreements as opposed to one overall agreement in the conspiracy as alleged. "[A] mere overlap of personnel or knowledge of another's illegal conduct is not by itself proof of a single conspiracy." *United States v. Peyro*, 786 F.2d 826, 829 (8th Cir. 1986).

"Duplicity" is the joining in a single count of two or more distinct and separate offenses. *United States v. Licciardi*, 30 F.3d 1127 (9th Cir. 1994). Where a single count in an indictment encompasses two or more distinct and separate offenses, counsel may move to dismiss the faulty count or may request that the trial court require the government to elect the count or offense on which it intends to present proof. See, e.g., *United States v. Universal C.I.T. Credit Corp.*, 344 United States 218, 225-26 (1952); *United States v. Aguilar*, 756 F.2d 1418 (9th Cir. 1985).

---

[2] The second superseding indictment does not contain any substantive distribution counts in the District of Nebraska- merely the conspiracy alleged in count I. Additionally, the second superseding indictment is not a "speaking" indictment and merely sets forth the essential elements of the statutory offenses. Finally, none of the forfeiture allegation set forth in the indictment at "a." through "t" involve property associated with Mr. Marshall.

[3] Discovery has been provided cumulatively as opposed to incrementally resulting in numerous unnecessary hours of review to determine what files, as provided, are considered "new files" as opposed to files previously disclosed which have also been provided in the "new" discovery. The government has provided thousands of pages of documents in electronic format. After well over 70 hours of review, the discovery has revealed extremely limited evidence against defendant Marshall.  This is not hyperbole: Counsel has yet to see defendant Marshall's legal name at all after full computer indexing of material provided to date.

Typically, "[t]he vices of duplicity arise from breaches of the defendant's Sixth Amendment right to knowledge of the charges against him, since conviction on a duplicitous count could be obtained without a unanimous verdict as to each of the offenses contained in the count." *United States v. Aguilar*, 756 F.2d 1418, 1424 n.2 (9th Cir. 1985); citing *United States v. UCO Oil Co.*, 546 F.2d 833, 835 (9th Cir. 1976). Duplicitous indictments can also "eviscerate the defendant's Fifth Amendment protection against double jeopardy, because of a lack of clarity concerning the offense for which he is charged or convicted." *Id*.; see also *Abney v. United States*, 431 U.S. 651, 654, 97 S.Ct. 2034, 2037, 52 L.Ed.2d 651 (1977). Additional concerns include prejudicial evidentiary rulings at trial and prejudice in obtaining appellate review. *United States v. Cooper*, 966 F.2d 936, 939 n. 3 (5th Cir. 1992).

Factors reviewed to determine the existence of multiple versus single conspiracies include whether the "…evidence consistently showed ... a singular purpose, exceedingly common identity of participants, [and an] incredibly small geography over a consistently large period of time" *United States v. Armstrong*, 60 F.4th 1151 (8th Cir. 2023). Additionally, "…whether a given case involves single or multiple conspiracies depends on whether there was one **overall** agreement to perform various functions to achieve the objectives of the conspiracy" *Armstrong*, supra (emphasis supplied), citing *United States v. Campbell*, 986 F.3d 782 (8th Cir. 2021). The inquiry into whether a defendant has agreed to join the conspiracy charged focuses on the scope of the activity in which the defendant agreed to join not merely the fact that multiple individuals are alleged to have participated. See, *Peyro*, supra.

The rationale for dismissing a single conspiracy count which, in fact, encompasses multiple conspiracies is based on the concept of impermissible variance of proof at trial. See *Stirone v. United States*, 361 United States 212 (1960). Accordingly, to determine whether a single conspiracy charge is duplicitous, courts consider such factors as the nature of the scheme, the identities of the parties, and the commonality of the time and goals. *United States v. Zemek*, 634 F.2d 1159, 1168 (9th Cir. 1980). Typically, if a court establishes that a count is duplicitous, the court must, at a minimum, order the government to elect between the separate offenses joined in that count to avoid a variance of proof at trial. *United States v. Droms*, 566 F.2d 361, 363 n.1 (2nd Cir. 1977); *Reno v. United States*, 317 F.2d 499, 502 (5th Cir.)

However, **and most importantly in this case specifically**, the duplicity, i.e. existence of multiple conspiracies, completely wrests jurisdiction from the United States District Court for the District of Nebraska.  The existence of multiple conspiracies, due to the nature of those conspiracies, removes the District of Nebraska as an appropriate venue to charge Mr. Marshall[4]. There is no nexus between this jurisdiction and the alleged factual basis for the discreet conspiracy which the government may be able to prove against Mr. Marshall and individuals in California.

The main issue before this Court involves the classic "hub and spoke" conspiracy which was addressed by the United States Supreme Court in *Kotteakos v United States* in 1946. The question thus arises whether the agreement between Leidermann  and Marshall to allegedly distribute marijuana and THC products in Maryland, and the agreement or agreements between Leidermann and the other alleged coconspirators to

---

[4] Venue is discussed more specifically below in subsection B.

distribute in other cities, were mere "separate adventures of like character," or whether "each was an aspect of an overall agreement to engage in a single conspiratorial adventure". *Kotteakos v. United States*, 328 U.S. 750, 769, 90 L. Ed. 1557, 66 S. Ct. 1239 (1946); *United States v. Sandridge*, 770 F.2d 744, 746 (8th Cir. 1985)

As explained in more detail below, Max Leidermann, James Reja and others including unindicted coconspirators, form the "hub", while numerous other codefendants serve as spokes. Unfortunately for the government, the nature of the evidence clearly shows that there is no "rim" connecting Mr. Marshall with the others named in the second superseding indictment. This is fatal to the indictment as there is nothing which establishes venue in the District of Nebraska in relation to Mr. Marshall because his agreement with Leidermann and others in California has nothing to do with Leidermann and the California individuals' agreement with others.

According to the government, Mr. Marshall operated in Maryland[5].  As more fully described below, it would be improper to try defendant Marshall along with defendants who were members in the entire overarching conspiracy, since the evidence in the case would relate to activities by those defendants in parts of the country completely unrelated to defendant Marshall's alleged role in Maryland. Marhsall is only, at most, a member of an agreement operating between California and Maryland. At a joint trial, the admission of evidence about distributions by the others to locations such as Omaha, Chicago, New York, Cincinnati, Miramar, and other cities across the county, would be improperly prejudicial to a defendant who was not part of the hub operating out of

---

[5] The defendant only knows this from the government's recitation of facts in its Motion for Stay and Review of Release Order (ECF #100) arguing for the detention of defendant Marshall. Discovery provided at this time does not disclose such information.

California with those in Nebraska or other states. There simply is no evidence Marshall was involved in, or agreed to be involved in, any activities taking place in other locations including Nebraska.

Assuming without conceding the government can show that Mr. Marshall was connected to the hub *via* Maryland, there is no jurisdiction in the District of Nebraska related to that discreet agreement. Since the actual conspiracy in which defendant Marshall is alleged to be a member operated between California and Maryland, this Court lacks jurisdiction for defendant Marshall's case because there is no venue nexus in this district. There are no allegations in *any* of the counts that tie Mr. Marshall's alleged agreement with the California participants to this district.

While the indictment alleges one overarching conspiracy whose members shared a mutual and combined goal to move marijuana and other products (vape pens, gummies, and related cannabis products), from California to cities across the United States, the only shared motive among members of the hub included having the proceeds of those sales returned to California. The hub of this wheel, in California, includes coconspirators Leidermann, Reja[6] and their "right hand man" turned informant, Ceasar Flores as well as potentially others.

The evidence also reflects many spokes emanating from the hub, each terminating in cities across the United States that received the shipments of marijuana and related cannabis products and redistributed the products in their geographic location. Each spoke is a conspiracy unto itself which also includes the hub. Any single spoke city conspiracy, however, is not the same conspiracy with any other spoke city.

---

[6] Reja is deceased.

Overlap in the center does not make this one large conspiracy because the individual spokes were not necessary nor dependent on each other for their own existence or agreements with the California hub. The ongoing operation between the California hub and for example, Omaha, Nebraska, was independent of the ongoing operation between the California hub and New York City. There is no evidentiary connection between the spoke cities.

   1. SPECIFIC FACTS RELEVANT TO THIS COURT'S ANALYSIS

      a. Leidermann, Reja, Colindres, and Justin Garringer.

Hundreds of pounds of marijuana allegedly left the hub in California in tractor trailers or smaller vehicles and was delivered to storage facilities and warehouses across the United States. The bulk cash was then returned to California in a similar fashion. At the center or hub of this criminal activity were lead defendants **David Leidermann** and **James Reja**[7]. If this were a chain or a pyramid conspiracy, those two men would be at the top**. Leidermann** was hands-on in the daily operations; **Reja** not so much. Under **Leidermann** were managers and lower-level workers who grew the marijuana or acquired it from growers, gathered and packaged the marijuana and other cannabis products for shipping. Certain members of the California hub went out with the loads to help with delivery, and/or met the loads in spoke cities, to support the delivery and bring the proceeds back to the hub. The evidence reflects that a man known as "Junior," identified as defendant **Gabriel Colindres, Jr.,** was an upper-level manager under **Leidermann** working in Los Angeles. **Colindres** oversaw much of the

---

[7] The names of the charged defendants in this Indictment are presented in bold to differentiate between the persons identified in the discovery who have not been indicted in this case, from the ones that have been indicted.

California operation and had an assistant, Katie, who was also involved daily. She scheduled the trucks, the marijuana pick-ups in California, and coordinated the drop-offs in the spoke cities across the United States. Katie also coordinated the cash being returned to California, specifically to **Leidermann** and **Reja**. This is evident from texts on Katie's (and others') telephones. Katie's conversations were with members of the California hub who were charged with the responsibility of moving the marijuana to the spoke cities. In addition to the contents of SMS or text messages, analysis of numbers called by members of the California hub, confirms they were all in regular contact with each other.

**Leidermann** caused the establishment of a moving company, "FAST BOX, LLC" with seven warehouses across the United States. The locations were in Maspeth, NY, Miramar, FL, Chicago, IL, North Hollywood, CA, Nashville, TN, Laurel, MD, and Cincinnati, OH. It should come as no surprise that these are some of the spoke cities. Cesar Flores worked directly for **Leidermann**, beginning in California in 1999 with grow and packaging operations. In 2014, **Leidermann** asked Flores to take over the New York operation. **Leidermann** paid Flores $20,000 a month for his work in New York. Surveillance by New York law enforcement had associated Cesar Flores with the FAST BOX warehouse in Maspeth, NY which is located in Queens.

Flores ultimately cooperated with law enforcement, conducted recorded calls with **Leidermann**, provided several extensive statements to law enforcement and confirmed his roles in California operations. He described how his father set up the FAST BOX LLC at his and **Leidermann's request** to be a legitimate front to the illegal activity. While still in California, Cesar Flores worked with both defendants **Gabriel**

8

**Colindres** and **Justin Garringer.** An examination of **Justin Garringer's** phone reflects contacts in common with other members identified as part of the California hub.

Defendants who were hands on growing marijuana and interacting with a contact in one or more spoke city, were defendants, **Eric Thibido, Evan Bowen,** and **Michael Garringer**, more fully discussed below.

Specific evidence of the trucking operation which captures the existence of the rimless hub conspiracy is as follows:

- On April 4, 2020, law enforcement observed a tractor trailer (Truck #1) at a FAST BOX the storage facility in Maspeth, NY. Ten large crates were loaded into that truck. On the same day, a second tractor trailer (Truck #2) was observed at a FAST BOX storage facility in Hollywood, CA, also being loaded with large crates. On April 6, 2020, Truck #1 arrived at the FAST BOX location in Hollywood, CA, and Truck #2 arrived at the FAST BOX location in Maspeth, NY. Both trucks were off-loaded at their respective locations.

- On April 14, 2020, Truck #1 was stopped by Oklahoma Highway Patrol, and $3,945,510.00 in United States currency was seized out of a crate on that truck. The crate was marked "Fast Box."

Agents confirmed that Re-Trans, a tractor-trailer brokerage company, had arranged for the movement of these tractor-trailers at the request of "Katie" with FAST BOX. The representative from Re-Trans confirmed that Re-Trans had provided tractor-trailers for FAST BOX since 2011. "Katie" had been the contact at FAST BOX since November of 2019, and had arranged for the transport resulting in the above-described nearly $4 million cash seizure. Re-Trans has arranged for tractor-trailer loads from North Hollywood to Chicago, Cincinnati, Baltimore, Maspeth, Nashville, and Miramar, FL.

Agents recorded a series of telephone conversations in the summer of 2020 between cooperator Cesar Flores, and **Leidermann.** The tenor of the conversation reflects that **Leidermann** is clearly the boss, and he was directing Flores regarding

changing the way they operate. Recent seizures by law enforcement around the country were causing **Leidermann** to change the transportation strategy. **Leidermann** wanted different companies with different businesses for each storage location. **Leidermann** states in one conversation, for example:

> "LA is one company right so maybe LA is LA Movers, one phone number, one address, great, but when it goes to it is going to be Bean Electronics with a number for Bean. When it goes to Wally, it is Wally Furniture with a number and an address for Wally."[8]

**Leidermann** also directs Flores regarding which drivers to use, where to proceed with deliveries next, and how to go about getting new and additional storage units. It is clear from these conversations that **Leidermann** relies on Flores to make the arrangements in the spoke cities on the east coast of the United States.

The most significant statements by **Leidermann**, which completely support defendant Marshall's multiple conspiracy argument, is **Leidermann**'s emphasis that others only needed to know what they need to know. In other words, **Leidermann** segregated and compartmentalized persons from each other, and portions of his overarching conspiracy from other portions of his overarching conspiracy. This was **Leidermann**'s design. This was a deliberate set-up. This was no doubt to insulate **Leidermann** from law enforcement, but it also caused the creation of separate conspiracies – spokes without a rim.

      b.    Eric Thibido and Evan Bowen.

On September 12, 2019, Tyler Gooch, (with addresses in Klamouth Falls and Bonanza, OR, as well as Redway and Garberville, CA), was arrested following an

---

[8] "Bean" and "Wally" are code names for spoke cities. "Bean" is likely Boston. Counsel believes "Wally" is Maryland, and therefore if defendant Marshall was in Maryland, it is a name that allegedly also refers to defendant Marshall interchangeably.

interdiction stop on I-80, and a canine hit by Sheriff's deputies in Lincoln, Nebraska. Gooch was eastbound and had in his possession 90 pounds of marijuana, 30 pounds of THC Shatter (cannabis extract), 3000 THC vape pens, and a pound of psilocybin mushrooms. Gooch was charged accordingly, and his telephone was seized. Gooch lived in California, and in this instance, he was delivering marijuana and related cannabis products to Omaha. Consistent with his role in the hub conspiracy, in Gooch's possession at the time of this arrest was a receipt for a storage unit in Redway, California. Agents also determined that in the two years between August of 2017 and September of 2019, Gooch reserved and stayed in fifty hotel rooms throughout the region, specifically at Best Western Hotels in Nebraska, Oregon, California, Nevada, Wyoming, Utah, and Illinois. Based on these facts related to Gooch, and measured against the structure of the hub conspiracy described above, one can conclude that Gooch was a member of the California hub conspiracy.

A relevant contact in Gooch's phone was Daniel Reigel. On January 19, 2020, law enforcement conducted surveillance on Daniel Reigel at his home in Papillion, Nebraska, a suburb of Omaha. Agents observed two men arrive at Reigel's home, and then depart. Reigel had been expecting a shipment of marijuana. After the delivery a search warrant was obtained for his residence. Recovered from Reigel's home following the departure of the two men was 100 pounds of marijuana, 30 pounds of TCH Shatter, and 2000 THC vape pens. Reigel then began cooperating with law enforcement and advised he had just paid $200,000 for that delivery.

Agents followed the two men, who Reigel confirmed had delivered the controlled substances, away from Reigel's house. An interdiction stop was conducted and the

men were identified Frederick Robey of Chicago, IL who was driving, and the passenger was identified as **Eric Thibido** with an address in Los Angeles, CA. That interdiction stop resulted in the seizure of more than $200,000 in United States Currency from **Thibido** and Robey.  Based on these facts, and measured against the framework described herein, Reigel would be a member of the spoke in Omaha, NE. **Thibido,** like Gooch, worked for the California hub conspiracy by delivering drugs and picking up the money to take back to **Leidermann**[9].  Agents observed contacts between **Thibido, Gabriel Colindres,** Katie, and other members of the hub based on phone analysis.  **Thibido** was clearly a member of the California hub and was sent out into the "field" to further the goals of that hub conspiracy in areas not including Maryland.

Another charged defendant with whom Reigel dealt, also a member of the California hub, is defendant, **Evan Bowen**, who Reigel met through Tyler Gooch.  **Bowen** lived in California and was actively involved in marijuana grow operations, as part of the hub.  Notably, Reigel traveled to California from Omaha on at least one occasion and had met with both Gooch and **Bowen** to purchase marijuana from them.  There is no evidence which counsel has seen that connects defendant Marshall to any activity involving **Thibido, Bowen, Colindres, Gooch or Reigel**.

c.  Michael Garringer

Agents working on this investigation observed defendant **Michael Garringer** at the FAST BOX warehouse in Westchester (Chicago), IL on April 11, 2020.  On that same date agents observed **Garringer** in a drug transaction with someone only

---

[9] If Reigel were charged for example in the District of Maryland, there is no question that the Maryland court would lack jurisdiction over Reigel's activities.  Defendant Marshall asserts that this is the same scenario for defendant Marshall whose activities are alleged to have occurred between CA and MD.

12

identified as "Borden" from whom agents seized 10 pounds of marijuana.  Cooperator

Flores advised that **Michael Garringer** operated in Chicago, Cincinnati, Nashville, and

Florida, at the direction of **Leidermann,** and prior to his work in the spoke cities,

**Garringer** worked directly with **Leidermann** in Los Angeles at the marijuana grow

operation.  Text conversations between **Garringer** and other members of the California

operations confirm his participation in California.  In April of 2020, there are dozens of

text conversations between Katie and **Garringer.**  For example, on April 14, 2020, Katie

texted "Need to book a fast Cal to Cindy for tomorrow."  It is likely that "Cindy" is code

for Cincinnati, Ohio.  Later that same day, Katie asked, "Can we book the Chicago to

Cali for Thursday thx."   On April 16, 2020, Katie asked **Garringer,** "Can we book an Ny

to Cali Saturday departure."  Consistent with Garringer's hands-on role organizing

deliveries to and from spoke cities are **Garringer's** texts with a representative from the

trucking company, "Re-Trans".  On April 10, 2020, **Garringer** advised, "Got ahold of

someone to move truck . . ."  Approximately two hours later, **Garringer** reported "Got

offloaded in Nashville."  On April 13, 2020, the Re-Trans representative advised, "Truck

going to NY to CA is fixed. They are rolling."   The next day, April 14, 2020, Garringer

advised, "Current location- by Tucumcari, NM  ETA is tonight around 11pm midnight,

want us to deliver then? . . . This is the NY to CA."  Later that same day, the Re-Trans

representative is quoting prices to Garringer: "OH to CA is 4400 IL to CA is 4250 OH &

IL to CA is going to be around 46-5000."  Without question, these conversations reflect

that while **Garringer** might be out in the spoke cities, he is acting in his role as a

member of the hub.  **Garringer** has also been placed at FAST BOX locations in

Cincinnati and Florida according to reports provided to date.

There are 72 reports of investigation (ROI) related to surveillances, seizures of marijuana, related products, and cash in and around Chicago.    The names of those participating in those activities include Christian Josue Ventura, Jonathan Blumwald, Ira Wrestler, Richmond Jesus Robles, Vincent Maiorano, Max Feketitsch, Yevgeniy Dets, Bradley Freedman, Frederick Robey, and others[10].  Defendant Marshall's name does not appear in any of those reports.

> d.    David Boese and Adam Bregman.

Reports and evidence regarding **David Boese**, reflect that he has an address in Sausalito, California, and has travelled between 2017 and 2020 to Omaha, Nebraska, Philadelphia, Pennsylvania, Wisconsin, Wyoming, Amarillo and locations in Canada.  Counsel has yet to see any narratives about his role, but the assumption based upon these few facts, likely places **Boese** in the California hub conspiracy.

The final defendant in the superseding Indictment, other than defendant Marshall, is **Adam Bregman**.  There is very little information about this defendant, but what is known is that **Bregman** lives in Los Angeles and has been identified as the "owner of Loud Pack Extracts and 710 King Pan brand TCH vapes."  An educated guess puts him as a supplier of the cannabis related products that the California hub conspiracy was distributing along with the marijuana, across the United States.  He is more likely a member of the California hub as a supplier than a recipient in a spoke city.

---

[10]  Frederick Robey was the individual with **Eric Thibido** in Omaha, Nebraska in September of 2019.  Robey provided a statement to law enforcement and admitted driving the drugs to Riegel's house in the Omaha suburbs, with the man he only knew as "**Eric.**"  Robey was paid $5,000 for driving **Thibido.**

There is no evidence produced to date that places defendant Marshall in that hub conspiracy. Even viewing the evidence in a light most favorable to the government, if Marshall was involved in a marijuana conspiracy, it took place between California and Baltimore, MD. It is improper for him to be joined with the defendants charged in the superseding indictment and it is improper for him to be indicted in the District of Nebraska.

> e. Defendant Richard Wesley Marshall.

According to the government's filings in this case, defendant Marshall operated in Maryland by receiving marijuana products from the Leidermann operation in California. Counsel has yet to see substantive evidence of that allegation in discovery. In relation to Maryland, discovery discloses an individual named Brian Helfman of Poughkeepsie, NY, who rented and used a storage facility in Jessup, Maryland, outside of Baltimore beginning in March of 2020. A search of Helfman's contacts in his telephone put him in contact with **Gabriel Colindres**, **Michael Garringer**, Tyler Gooch, and others. These reports do not reference defendant Marshall, but the government alleges in court filings related to the detention of Marshall that travel records for Marshall between 2014 and 2020 reflect that his travel to Baltimore coincided with FAST BOX transportation records showing deliveries to Maryland. While such allegations could be consistent with discovery regarding air travel, the government failed to mention in those filings that Marshall grew up in Maryland and still has family in Maryland.

The government also alleges in court filings that Marshall was directly involved with the seizure of 849 pounds of marijuana in June of 2020 near Baltimore,

MD.  Counsel has yet to see a report related to that seizure nor any description of Marshall's involvement with same.  If there exists other evidence (surveillance of Marshall, undercover recordings of Marshall, seizures of drugs or money from Marshall, debriefings of cooperators who talked about Marshall, etc.), counsel has not seen it.  Regardless, such information does not in any way impact the existence of multiple conspiracies in this case.

The one notation observed by counsel, which relates to "Wally" – that counsel understands might relate to Maryland and possibly defendant Marshall, is that "Wally" was a "trusted client" of Leidermann.  This report, authored by a DHS agent and approved by a DHS supervisor in 2023, is a conclusion for which the defense has yet to see the evidence.  Assuming the truth of this conclusion, this is the sum-total of the government's evidence against defendant Marshall.  There is no reason in law or in fact that would justify trying defendant Marshall with any of his indicted co-conspirators *en masse*, especially given a lack of jurisdiction in this district.

Given all of the foregoing, the government has unlawfully indicted Mr. Marshall as part of a "rimless wheel" conspiracy barred by the Supreme Court's decision in *Kotteakos v. United States*, 328 U.S. 750 (1946). In *Kotteakos*, the government alleged that a single hub figure had assisted otherwise unrelated clients or groups of clients in fraudulently obtaining separate loans. *Id*. at 752-55. The government indicted the hub figure and his clients as part of one overarching conspiracy. *Id*. at 752-53. The Supreme Court concluded that the evidence did not show that several client/defendants had agreed to participate in a single conspiracy with the other clients. *Id*. at 754-55. Instead, "the pattern was that of separate spokes meeting at a common center . . . without the

16

rim of the wheel to enclose the spokes," which "made out a case, not of a single conspiracy, but of several." *Id.* at 755 (internal quotation marks omitted)

In this case whatever agreement might have allegedly existed between the "hub" (Leidermann et. al. in California), and the "spoke", Marshall in Maryland, there is no evidence to find that Marshall agreed to conspire with any, much less, each of the other alleged coconspirators which is required to complete the "rim". The overarching conspiracy charged alleged in count I is merely a ruse to vest jurisdiction in the District of Nebraska when there clearly is no nexus to Nebraska involved in the alleged conspiracy involving Leidermann, Reja and Marshall.

B.    THE DISTRICT OF NEBRASKA IS THE IMPROPER VENUE

Perhaps one of the more notable recent cases to address the issue of venue is *United States v Fortenberry*, 89 F.4th 702 (9th Cir. 2023). Fortenberry, a Nebraska representative in Congress, was alleged to have made false statements to federal agents in regard to an investigation into campaign finances. He was indicted in California where the investigating agents were based and the alleged illegal contribution was made. The alleged false statements were made in Washington D.C. and Lincoln, NE. His conviction was reversed due to improper venue. The court in *Fortenberry* set forth the underpinnings of the importance of establishing proper venue in criminal cases. In discussing the issue, the court stated,

> Questions of venue in criminal cases . . . are not merely matters of formal legal procedure. *United States v. Johnson*, 323 U.S. 273, 276 (1944). They present policy concerns deeply rooted in the Constitution. Aware of the unfairness and hardship to which trial in an environment alien to the accused exposes him, *Johnson*. at 275, the Framers drafted the Venue Clause, which mandates that the 'Trial of all Crimes . . . shall be held in the State where the . . . Crimes shall

17

have been committed.' *Smith v. United States*, 599 U.S. 236, 242–43 (2023)
(quoting United States Const. art. III, § 2, cl. 3). This command is reinforced by
the Vicinage Clause of the Sixth Amendment, which "guarantees 'the right to . . .
an impartial jury of the State and district wherein the crime shall have been
committed.'" Smith. at 244–45 (quoting United States Const. amend. VI).

*Fortenberry,* 89 F. 4th at 705.

While *Fortenberry* is not a drug conspiracy case, the constitutional imperative of
proper venue is not devalued by the nature of the charges. The Eighth Circuit Court of
Appeals has stated:

> Proper venue is required by Article III, § 2 of the United States Constitution and
> by the Sixth Amendment, as well as Rule 18 of the Federal Rules of Criminal
> Procedure. A violation of federal law may be prosecuted in any district in which
> such offense was begun, continued, or completed. Furthermore, although
> separate proof of an overt act is not a necessary element of a drug conspiracy
> under 21 U.S.C. § 846, venue is proper in a conspiracy case in any jurisdiction in
> which an overt act in furtherance of the conspiracy was committed by any of the
> conspirators.

*United States v. Morales*, 445 F.3d 1081 (8th Cir. 2006)(citations omitted)

Specifically, as it relates to Mr. Marshall, the existence of a distinct and separate
alleged agreement wrests jurisdiction from the District of Nebraska because the
requirement of venue has not been met. While Leidermann operated a distinct
conspiracy in Nebraska with Reigel, Gooch and others, Mr. Marshall was not part of that
agreement. It cannot be shown that any overt act in furtherance of Mr. Marshall's
alleged agreement with Leidermann to distribute marijuana and THC products in
Maryland was committed in the District of Nebraska. There is no evidence that Mr.
Marshall and any other member of the California hub met in Nebraska to make an
agreement related to Maryland, used Nebraska as a storage point for controlled

substances delivered to Maryland or required any contact with Nebraska to commit any overt act in furtherance of the alleged conspiracy involving Maryland. The mere allegation that Leidermann had transported controlled substances too and received proceeds from an individual in Nebraska is clearly insufficient to create proper venue in Nebraska. Those activities were a part of a discreet agreement between the hub members and the Nebraska conspirator. As a result, counts I, II and III of the second superseding indictment must be dismissed due to lack of venue in the District of Nebraska.

I.    COUNTS II AND III OF THE SECOND SUPERSEDING INDICTMENT ARE DUPLICITOUS, DEFECTIVE AND FAIL TO ESTABLISH VENUE IN NEBRASKA REQUIRING DISMISSAL REGARDLESS OF THE EXISTENCE OF AN OVERALL CONSPIRACY AS ALLEGED IN COUNT I OF THE SECOND SUPERSEDING INDICTMENT

Assuming without conceding that an overall conspiracy, as opposed to multiple discreet conspiracies exists, counts II and III fail to adequately alleged specific transactions related to each count occurring in the District of Nebraska nor are there any overt acts alleged establishing venue in Nebraska in regard to count III.

Count II of the second superseding indictment alleges:

> From an unknown date but at least as early as August 1, 2014, and continuing to August 31, 2021, in the District of Nebraska and elsewhere, the defendants DAVID LEIDERMANN, JAMES REJA, ERIC THIBODO, EV AN BOWEN, DAVID KYLE BOESE, ADAM ROSS BREGMAN,.GABRIEL R. COLINDRES, JUSTIN GARRINGER, MICHAEL GARRINGER, RICHARD WESLEY MARSHALL, and TYLER JOHN WITTEMAN, did knowingly conduct, attempt to conduct, and cause to be conducted, financial transactions affecting interstate commerce

which involved the proceeds of a specified unlawful activity, that is: Distribution and Conspiracy to Distribute and Possess with Intent to Distribute Marijuana and THC, its salts, isomers, and salts of isomers, in violation of Title 21, United States Code, Sections 841 and 846, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location and source of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity. In violation of Title 18, United States Code, Section 1956(a)(l)(B)(i).

Count II does not allege a conspiracy but alleges that substantive financial transactions were knowingly conducted, attempted to be conducted and caused to be conducted financial transactions involving proceeds of the specified unlawful activity. "[I]t is the individual acts of money laundering which are prohibited under section 1956(a)(1)(B)(i), and not the course of action which those individual acts may constitute." *United States v. Prescott*, 42 F.3d 1165, 1166 (8th Cir. 1994) citing, *United States v. Martin*, 933 F.2d 609, 611 (8th Cir. 1991) referencing *Blockburger v United States*, 284 U.S. at 302, 52 S.Ct. at 181. The second superseding indictment in this case merely alleges a "course of action". There are no allegations of any individual acts of money laundering alleged. The count fails to describe an offense under the statute, is defective and duplicitous. As a result, there is no jurisdiction over the offense in this Court and it must be dismissed.

Count III suffers from the same defects and must be dismissed as well. The allegations in that count are, again, a "course of action" and fail to establish any agreement or transactions occurring in the District of Nebraska.

In *United States v. Cabrales*, 524 U.S. 1 (1984) the United States Supreme Court dismissed counts involving money laundering and reporting charges because there was a lack of venue. Cabrales was indicted in Missouri, yet the money laundering charges involved financial transactions in Florida. Notably, in *Cabrales* there were specific allegations of money being deposited in Florida from proceeds derived in the place of indictment, while such allegations are not present in the instant case, even the allegations in *Cabrales* were of "no moment" in establishing proper venue for money laundering. *Cabrales* at 8. The Court stated, "Here, the crimes described in Counts II and III are defined in statutory proscriptions, 18 U.S.C. §§ 1956(a)(1)(B)(ii), 1957, that interdict only the financial transactions (acts located entirely in Florida), not the anterior criminal conduct that yielded the funds allegedly laundered." *Cabrales*, 524 U.S. at 7.

CONCLUSION

For the foregoing reasons the second superseding indictment must be dismissed in relation to Richard Marshall due to lack of venue in the District of Nebraska.

RICHARD WESLEY MARSHALL, Defendant.

BY:    s/ Jerry M. Hug

#21015
Hug & Jacobs, LLC
209 S 19th St, #340
Omaha, NE 68102
(402) 614-6160
jerry@hugandjacobs.com

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 11th day of June, 2024 the above Motion to Continue was filed via the ECF system in the United States District Court for the District of Nebraska and that system sent electronic notice to: Thomas Kangior, AUSA.

/s Jerry M. Hug